UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

v.

FRANKIE COOK and SHAWNTEE
ELLISON,

                        Defendants.
_____

**REPORT AND
RECOMMENDATION**

20-CR-00084(LJV)(JJM)

       Defendants Frankie Cook and Shawntee Ellison are charged in a five-count

Indictment [1][1] with conspiracy to possess with intent to distribute 100 grams or more of a

mixture containing heroin and 40 grams or more of mixture containing fentanyl, in violation of

21 U.S.C. §846; unlawful possession of such materials with intent to distribute, in violation of 21

U.S.C. §§841(a)(1), 841(b)(1)(B) and 18 U.S.C. §2; maintaining a drug-involved premises, in

violation of 21 U.S.C. §856 and 18 U.S.C. §2; and possession of a firearm in furtherance of drug

trafficking offenses, in violation of 18 U.S.C. §§924(c)(1)(A)(i) and 2.  Defendant Cook is

further charged with being a felon in possession of a firearm, in violation of 18 U.S.C.

§§922(g)(1) and 924(a)(2).

       These charges arise from a February 26, 2020 search of their residence at 484

Dartmouth Avenue in the City of Buffalo, conducted while Cook was on New York State

probation for a firearm offense conviction.  Before the court are defendants' motions to suppress

all evidence arising from that search, and to suppress the recorded statements that they made

while together in a police interview room following their arrest (Benz Affirmation [32] at §§I, II;

---

[1]     Bracketed references are to CM/ECF docket entries, and page references are to CM/ECF
pagination.

Okay Affirmation [33], §§I, II),[2] which have been referred to me by District Judge Lawrence J. Vilardo for initial consideration [19]. An evidentiary hearing was conducted on March 1, 2021 concerning defendants' motion to suppress the evidence seized as a result of the search, at which Erie County Probation Officer Deneen Anderson testified [63]. Having reviewed the parties' submissions [32-37, 67-69, 73-75] and heard oral argument on November 30, 2020 and May 18, 2021 [38, 76], for the following reasons I recommend that Ellison's motion be denied, and that Cook's motion be granted in part and denied in part.

## FACTS

On February 11, 2020, Cook was placed on probation and assigned to the Gun Involved Violence Elimination ("GIVE") Program because his Buffalo City Court conviction was for a firearm offense. March 1, 2021 hearing transcript [63] at 9, 29-30; gov. ex. 6 [62] at 22.[3] At that time, Cook signed his probation conditions, which, *inter alia*, required him to "permit the Probation Department to visit" him at his residence and to "submit to warrantless search[es] of [his] person, property, residence or vehicle upon the request of the Probation Department". Id. at 9-10, 31-32; gov. ex. [6] at 23, ¶¶4, 6.

As part of the routine initial GIVE notification session given to all probationers placed in the program, on February 26, 2020 Officer Anderson and at least seven other members of the GIVE Program, including her partner Probation Officer Scott Harmon, Supervisor William Diamond, as well as two other Probation Officers, members of the Erie County Sheriff's

---

[2]     Based on the government's representations at the November 30, 2020 oral argument, I deemed the remaining discovery issues resolved, without prejudice to renewal. *See* November 30, 2020 Text Order [41].

[3]     Cook was convicted of attempted criminal possession of a weapon in the second degree, in violation of New York State Penal Law §110-265.03(3).

Department, Buffalo Police Department, and the Peacemakers community organization went to

the single family residence at 484 Dartmouth Avenue that Cook shared with his girlfriend Ellison

and their two children for a scheduled visit.  Id. at 11-12, 36-37.   The purpose of these sessions

is to "introduce the team", "meet the family", and advise them about the program.  Id. at 35.

Although the initial GIVE notification session is not a home visit, the probation officers still look

to make sure that everything is safe, that no crime is occurring, and that the probationer is in

compliance with the terms of his/her release.  Id. at 82-83. The visit to Cook's residence "was a

typical GIVE notification session", no different from what was conducted with other

probationers in the program. Id. at 71-72.

        Officer Anderson entered the residence with Officer Harmon and Supervisor

Diamond. Id. at 71.  Cook, Ellison and their two children were located in the living room

adjacent to the entrance.  Id. at 37-38.   Initially, Officer Diamond explained the GIVE Program

to Cook, including why the team was present.  Id. at 12.  At that time, the only other individuals

present in the living room with Cook's family were Officers Anderson and Harmon.  Id. at 42.

The remaining members of the team remained outside.  Id. at 41-42.

        According to Officer Anderson, part of the GIVE program includes a cell phone

search to ensure that the probationer is not posting anything involving firearms on social media,

in order to "keep them safe".  Id. at 33-34.  However, before the February 26, 2020 visit, Officer

Anderson did not check Cook's social media accounts.  Id. at 34-35.  She also had no specific

reason to believe that firearms were located on the premises. Id. at 73. After being in the

residence for approximately five minutes, Officer Anderson asked Cook to see his cellular

telephone, but he informed her that he used Ellison's because he did not own one himself. Id. at

13, 41, 73. Officer Anderson asked if she could see the phone, and Cook said that it was

downstairs. Id.   Officers Anderson and Harmon, both of whom were armed, followed Cook through the residence to the basement for "safety reasons". Id. at 14, 19, 43-44.  According to Officer Anderson, policy and procedure required that she not let a probationer out of her sight. Id. at 73.  Their goal was to look through the cell phone. Id. at 43.

As they descended into the basement, Cook explained that it was his "little man cave". Id. at 14.  Upon entering the basement toward the rear of the home, Officer Anderson observed a pit bull puppy chained to a metal pole in the middle of the basement. Id. at 14, 45. Cook explained that he was using the animal as a guard dog and did not want him to be around the family. Id. at 15.

Officer Anderson's focus was on Cook retrieving the phone, which she believed he retrieved from "near the couch area" Id. at 49. Meanwhile, Officer Harmon was "eyeballing everything".  Id. at 50. Toward the opposite end of the basement (*i.e.*, front of the house), Officer Anderson observed a counter with baggies, plastic gloves, and masks, which she considered to be drug paraphernalia, as well as a large speaker blocking a door, all of which raised her suspicion.  Id. at 15, 17-18, 50, 56-57. After observing the items on the counter, Officer Anderson obtained the phone from Cook, but could not recall whether she started reviewing it at that time or later.  Id. at 50.

As reflected in Defense Exhibit 12B ([61-7] at 2), Officer Anderson acknowledged that from the bottom of the basement stairs, there was a furnace, hot water heater and pole that obscured the view of the counter.  Id. at 48:



The speaker was located to toward the right front of the house when viewed from the same vantage point and blocked the door next to the washing machine. Id. at 45-49; def. exs. 11F and 12A.





Further raising her suspicion, Cook "kept looking over at the door and the counter". Id. at 50, 19. Although Officer Anderson's testimony is not consistent as to when and where this occurred, she also observed a large quantity of money "near a purse on the couch", which added to her suspicion, but the money was never seized. Id. at 59-60.

Once she developed this suspicion, Officer Anderson walked Cook upstairs, and at that time Officer Harmon was moving the speaker. Id. at 19-20, 50. While upstairs, she informed her supervisor to keep Cook there and radioed the officers, who were outside. Id. at 50-51. When she returned to the basement seconds later, Officer Harmon was searching the basement. He opened the door behind the speaker, which revealed a "little alcove" with a large safe. Id. at 19-20, 51; gov. ex. 4 [62] at 8.

Cook was asked for the keys to the safe, but "said he didn't know where the keys were". Id. at 27.[4]  He was also asked for the combination, but stated that he "forgot" it "[a]nd then he said it is his landlord's safe". Id. at 27, 84.  Cook provided the name and telephone number of his landlord, but law enforcement was unable to reach him. Id. at 27-28.

Officer Anderson attempted to open the safe, but was not able to do so and believed that it was locked. Id. at 64.  No one else present attempted to open it. Id. at 65. Initially, Officer Anderson called the Buffalo Police Department and was informed that a search warrant would be necessary to remove the safe, since it could not be opened. Id. at 66.  Officer Anderson also called Sheriff's Deputy Robert Galbraith for assistance, and when he arrived "he gave a hard tug . . . hip down and it opened". Id. at 64-66.  Although Officer Anderson did not observe him open the safe, it did not appear damaged after it was opened. Id. at 21, 66, 84-85.

A variety of contraband was recovered from the safe, including a firearm and substances later confirmed to be heroin and fentanyl. Id. at 23-26.  Two smaller safes were also located in the upstairs of the house, and Cook provided the key to one of the safes in exchange for a cigarette. Id. at 67-68.  Nothing was recovered from those safes. Id.

## DISCUSSION

**A.    Motion to Suppress Evidence**

"[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment - subject only to a few

---

[4]    From the photograph (gov. ex. 4A [62] at 8), the safe appears to be a combination safe and Officer Anderson testified that "it definitely was a combination safe", but did not remember whether it could also be opened with a key. [63] at 64.

specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967).

### 1.    Did the Warrantless Search Condition Permit a Suspicionless Search?

The government takes contrary positions concerning whether Cook maintained an expectation of privacy as a result of the warrantless search condition imposed as part of his probation.  It vacillates between Cook having "no reasonable expectation of privacy" (government's Response [34] at 3), to his having a "significantly diminished", expectation of privacy. Id. See also [67] at 5 ("[i]nherent in authorized supervision is a diminution of the probationer's right to privacy").

The latter position is correct.  "Probationers, parolees, and persons subject to supervised release have 'significantly diminished' expectations of privacy." United States v. Lambus, 897 F.3d 368, 402 (2d Cir. 2018).[5] See also United States v. Chirino, 483 F.3d 141,148 (2d Cir. 2007) ("Chirino's 'status as a probationer diminishe[d] his reasonable expectation of privacy'"); United States v. DiTomasso, 56 F. Supp. 3d 584, 595 n. 72 (S.D.N.Y. 2014) ("[i]n the Second Circuit, the rule is that consent-to-search provisions attenuate, but do not destroy, the need for a baseline level of suspicion in searches by probation officers"). Consequently, "'[w]hen an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity,' the officer's search of the probationer's residence without a warrant does not violate the Fourth Amendment." Haynes v. Zaporowski, 521 Fed. App'x 24, 26 (2d Cir. 2013) (Summary Order) (quoting United States v. Knights, 534 U.S. 112, 121 (2001)).

---

[5]    On a continuum, "parolees have fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is to imprisonment". Samson v. California, 547 U.S. 843, 850 (2006).

*See also* <u>United States v. Harris</u>, 2021 WL 1512724, *3 (S.D.N.Y. 2021) (an exception to the warrant requirement exists "where a warrantless search is authorized by a condition of probation and is supported by reasonable suspicion"); <u>United States v. DeJesus</u>, 2021 WL 1885162, *8 (S.D.N.Y. 2021) ("searches of probationers . . . under New York statutory law may be conducted only based upon 'reasonable cause to believe that the defendant has violated a condition of the sentence'" *quoting* N.Y. Crim. P. L. § 410.50).

Ellison's expectation of privacy was similar to Cook's. *See* <u>United States v. Lovelock</u>, 170 F.3d 339, 345 (2d Cir. 1999) ("[a] person who occupies premises jointly with another has a reduced expectation of privacy since he assumes the risk that his house-mate may engage in conduct that authorizes entry into the premises").

## 2. Did Law Enforcement Develop Reasonable Suspicion for the Search?

An officer has "reasonable suspicion when [s]he is in possession of specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion." <u>United States v. Ojudun</u>, 915 F.3d 875, 882 (2d Cir. 2019). "The standard takes into account the totality of the circumstances - the whole picture. Although a mere 'hunch' does not create reasonable suspicion . . . the level of suspicion the standard requires is "considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause". <u>Navarette v. California</u>, 572 U.S. 393, 397 (2014).

Initially, Officer Anderson testified that her observation of baggies, plastic gloves, and masks on the counter, which she believed to constitute drug paraphernalia, coupled with a large speaker blocking a door, the presence of a guard dog (in training), and Cook's glances at the door and counter, gave rise to her suspicion that a search was warranted. [63] at 15, 17-18, 50. For the first time on cross-examination, Officer Anderson also appeared to testify that her

observation of a large quantity of money in plain view on a couch in the basement was also a factor that provided reasonable suspicion for the subsequent search. Id. at 58-60 ("[t]he money was near her purse on the -- or near a purse on the couch . . . . that, along with the drug paraphernalia that I saw on the counter, was again all took into consideration me moving her upstairs -- moving him upstairs").

However, from other portions of her testimony, it is not clear whether her observation of the money occurred in the basement prior to the search, on an upstairs couch, or after the search commenced. In fact, Ellison's counsel stated that the couch was upstairs. Id. at 81. Officer Anderson also appeared to testify that the money was not in plain view and recovered during the search. Id. ("Q. . . . Was it just . . . a pile of money was sitting there, a stack of bills? A. No, it wasn't like right there, but -- and it was Harmon who found it, and I saw it when he pulled it out, but it was over near her purse on the couch. He went and said, oh, look . . . and he pulled it out and showed me the money"); Id. at 58-59 ("Q. . . .you didn't see any [other types of drug paraphernalia] in the basement *when you and your partner were searching*, correct? A. There was a large amount of money on the couch" (emphasis added)).

Given her conflicting testimony on this issue, I conclude that the money was not observed in plain view prior to the search. Nevertheless, on balance, I conclude that the remaining observations made by Officer Anderson were sufficient to establish reasonable suspicion for the search.

I "cannot merely defer to police officers' judgment in assessing reasonable suspicion", but rather "must view the totality of the circumstances through the eyes of a reasonable and cautious police officer on the scene." United States v. Bailey, 743 F.3d 322, 332 (2d Cir. 2014). Viewed through that lens, the presence of gloves, masks and baggies collectively

with Cook's furtive glances and the presence of a larger speaker blocking a door, and a guard dog in training, were sufficient (albeit narrowly) to demonstrate reasonable suspicion that illegal drug activity was occurring.  Officer Anderson acknowledged in her testimony ([63] at 54) that, standing alone, there was not anything inherently suspicious about the common household (baggies, masks and gloves) items she observed. Yet I must evaluate the totality of the circumstances, and those seemingly benign items take on a different hue when viewed in that light. *See* United States v. Stigler, 2008 WL 11429610, *4 (S.D. Iowa 2008) ("[p]lastic baggies are often associated with the illegal drug trade"); United States v. Coulombe, 2007 WL 4192005, *5 (N.D.N.Y. 2007) ("[w]hile no single factor is dispositive, courts have sometimes focused on certain factors that are especially probative, including a suspect's . . . . nervous behavior or demeanor"). *See also* United States v. Jackson, 663 Fed. App'x 31, 34 (2d Cir. 2016) Summary Order) ("[e]ven if each of these facts, viewed in isolation, would not necessarily establish reasonable suspicion that Jackson had become involved in drug trafficking, when considered in the aggregate, they certainly do").

3. **Did Law Enforcement Conduct a Warrantless Search Prior to Developing Reasonable Suspicion?**

Defendants argue that "law enforcement lacked reasonable suspicion when it entered Mr. Cook's home to search his phone". Cook's Post-hearing Brief [69] at 6 (emphasis omitted).  That is true, but there is no evidence that a search of his phone occurred prior to the development of reasonable suspicion.  Defendants also argue that "the demand to search Mr. Cook's cell phone was unlawful, and that all subsequent observations are tainted and must be suppressed".  *See* Cook's Post-Hearing Brief [69] at 9.  In response, the government argues that Cook's conduct was consensual.  Government's Reply [73] at 3.

"[O]ne of the specifically established exceptions to the requirement[ ] of . . . a warrant . . . is a search that is conducted pursuant to consent." Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).  "The Government has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority." United States v. Couch, 378 F. Supp. 2d 50, 61 (N.D.N.Y. 2005). "Where, as here, the Government asserts that the subject of a search [or seizure] provided implied consent, the 'ultimate question presented is whether the officer had a reasonable basis for believing that there had been consent to the search [or seizure].'" United States v. Wilson, 914 F. Supp. 2d 550, 565 (S.D.N.Y. 2012) (quoting United States v. Garcia, 56 F.3d 418, 423 (2d Cir. 1995)).  In other words, "what would the typical reasonable person have understood by the exchange between the officer and the suspect?" Florida v. Jimeno, 500 U.S. 248, 251 (1991).

Contrary to defendants' contention that there was a "demand to search Mr. Cook's cell phone" (Cook's Post-Hearing Brief [69] at 9), the uncontested testimony by Officer Anderson establishes that Cook's decision to retrieve the phone for Officer Anderson was consensual.  Officer Anderson testified:  "I said can I see [the cell phone]? He said it's downstairs".  [63] at 13.  The officers then followed Cook to the basement. Id. at 14.   As the government noted at the May 18, 2021 oral argument, Cook could have objected to Officer Anderson's request.  Likewise, nothing in the record indicates that Ellison, who was present in the living room and owner of the phone, voiced objection to the request.

Ellison points to the following testimony from Officer Anderson as establishing that her "announced intention" was to search and seize the cell phone (Post-Hearing Submission [68] at 4): "I asked to see his cell phone, which we do, and he said he uses his girlfriend's cell

phone. [63] at 13 (emphasis added).  Consent can be invalidated where it arises from "[a]n officer's claim of authority to seize", which "is in effect a claim that the person does not have a right to resist the seizure".  United States v. Escobar, 2003 WL 22709272, *6 (D. Neb.  2003), aff'd, 389 F.3d 781 (8th Cir. 2004).  Even though it was Officer Anderson's intention to search the cell phone as part of the GIVE program ([63] at 33), I do not view her testimony as establishing that she informed Cook that she was seizing or searching the phone pursuant to the conditions of his probation or any other authority. There is nothing from defendants establishing otherwise. Nor is there any evidence of coercive conduct leading to Cook's consent. See Bumper v. North Carolina, 391 U.S. 543, 550 (1968) ("[w]here there is coercion there cannot be consent").

          The officer safety rationale for Officer Anderson to have followed Cook into the basement is not challenged by defendants – instead, they argue that Officer Harmon's entry into the basement and conduct in "eyeballing everything" once in the basement exceeded the scope of the officer safety justification.  Cook's Post-hearing Brief [69] at 10-11.[6]  Specifically, they note that "[i]f safety were in fact Officer Harmon's concern, surely he would have been watching Mr. Cook, the only other non-law enforcement individual in the basement at that time, rather than wandering around the basement 'eyeballing' things".  Id. at 11, 12 ("Officer Harmon's roaming

---

[6]        There is no discussion by the parties of the "officer safety" rationale offered by Officer Anderson, but it appears aligned with a protective sweep, which is permissible in circumstances other than arrest warrant executions.  See United States v. Miller, 430 F.3d 93, 100 (2d Cir. 2005) ("we hold that specific, articulable facts giving rise to a reasonable inference of danger may justify a protective sweep in circumstances other than during the in-home execution of an arrest warrant").  In any event, it is unnecessary for me to delve deeper into this issue because defendants do not appear to dispute that it was a permissible basis for Officer Anderson to enter the basement, and instead focus on Officer Harmon's presence and conduct.  See Cook Post-Hearing Brief [69] at 11 (Officer Harmon's "entry into - and continued presence in - the basement simply cannot be justified by the need to ensure officer safety").

presence in the basement was more akin to a warrantless search of Mr. Cook's home than a simple home visit, his subsequent actions are tainted by this unlawful activity"). [7]

Even if Officer Harmon's observations exceeded the justification for his entry into the basement, Officer Anderson developed reasonable suspicion though her *own* observations.    She too observed the gloves, masks, baggies, the large speaker blocking the door, and Cook's furtive glances. [63] at 15, 17-19, 80.  As defendants note, it seems from the basement photographs (def. ex. 12B) that the home's mechanicals would have obstructed her view of the counter when she first entered the basement. Cook's Post-Hearing Brief [69] at 10. While Officer Anderson appears to have followed Cook throughout some portion of the basement as he retrieved his phone, there is nothing to suggest that her movements exceeded what was necessary for officer safety.

Much of defendants' argument centers on disputing the credibility of Officer Anderson.  "It is within the province of the district court as the trier of fact to decide whose testimony should be credited." Krist v. Kolombos Rest. Inc., 688 F.3d 89, 95 (2d Cir. 2012). An adverse credibility determination is "appropriately based upon inconsistent statements,

---

[7]    Although potentially supportive, the government does not rely on the home visit condition of Cook's probation as authority for the officers' entry into the basement. *See* United States v. Newton, 181 F. Supp. 2d 157, 161 (E.D.N.Y. 2002), aff'd, 369 F.3d 659 (2d Cir. 2004) ("[a] home visit is not a search, even though a visit may result in seizure of contraband in plain view. . . . There is a common sense distinction between visits and searches: searches are an intrusive, probing endeavor, while home visits are much more restricted in scope"); United States v. Reyes, 283 F.3d 446, 462 (2d Cir. 2002) ("a home visit is far less intrusive than a probation search, probation officers conducting a home visit are not subject to the reasonable suspicion standard applicable to probation searches under Knights"); United States v. Bell, 2020 WL 5849376, *4 (N.D. Ohio 2020); United States v. LeBlanc, 490 F.3d 361, 370 (5th Cir. 2007) ("LeBlanc, as a probationer with diminished expectations of privacy, cannot expect that a probation officer will not view the various rooms in his home while conducting a home visit to verify that his residence there is genuine and suitable").

contradictory evidence, and inherently improbable testimony". <u>Diallo v. I.N.S.</u>, 232 F.3d 279, 287–88 (2d Cir. 2000).

Defendants contend that Officer Anderson's testimony at Cook's state felony hearing - just eight days after the search - conflicts in several critical respects with her suppression hearing. First, they argue that Officer Anderson's earlier testimony "is unambiguous: Officer Harmon 'was searching the basement' while Mr. Cook retrieved his phone". Cook's Post-Hearing Brief [69] at 12. At the felony hearing, she testified:

"Q. And while you're upstairs Officer Harmon is the only officer in the basement?

A. Yeah, for like a second, yes.

Q. And he's at that point searching the basement, correct?

A. When I came down, yes, yeah, he was searching the basement, yeah.

Q. Okay. And what was the purpose of that?

A: As we were – as my partner was searching the basement, Mr. Cook gave me the phone that belonged to his girlfriend and him. I walked him back upstairs and then I went back downstairs to complete the search and look with my partner and that is when we found the door with a speaker in front of it and we found the safe." [61-3] at 5.

Her cumulative testimony was not appreciably different at the hearing:

"Q. Now, once you developed this suspicion, what did you do?

A. I walked Mr. Cook upstairs and I came back downstairs. My partner was moving the speaker, opened the door, he walked in and said there was a safe in there". [63] at 19, 20 ("I was walking upstairs, he was moving the speaker. When I came downstairs, he was finished moving the speaker, he opened the door, and he was the first one to walk into the room"), 50 ("I can't remember if I started looking through [Cook's phone in the basement]. . . but at that point the vibe from me . . .  with the things that we saw with the gloves and the masks and what he said about the dog and he kept looking over at the door and the counter, that's when -- I don't remember if I looked at the phone then, but that's when I ended up taking him upstairs").

-15-

Nothing in either testimony (either before the state court or before me) indicates that Officer Harmon instituted a search prior to the observations that gave rise to reasonable suspicion.

Defendants also point to the fact that at no time during the felony hearing and not until her cross-examination before me, did Officer Anderson mention her observation of a large sum of money on the couch, a fact not documented in the search documentation. Cook's Reply [74] at 5. According to them, either the money "was pocketed" or non-existent and was "yet another attempt [by Officer Anderson] to bolster a faltering determination of reasonable suspicion". Id.

I find it curious that the money - which Officer Anderson estimated totaled $2,000 and acknowledged could constitute drug paraphernalia - was not seized. [63] at 59-60, 81. Yet there is nothing from defendants to indicate that money was seized from their home. As discussed above, because of the variations in Officer Anderson's testimony concerning the location and timing of the observation of large quantity of cash on the couch, I have not considered that as part of the reasonable suspicion determination, but I do not find those variations in her testimony sufficient to defeat her credibility as a whole. *See* Krist, 688 F.3d at 95 ("as trier of fact, the judge is entitled, just as a jury would be to believe some parts and disbelieve other parts of the testimony of any given witness").

### 4.     Did the Search Exceed the Scope of the Officer's Reasonable Suspicion?

Relying heavily on United States v. Robertson, 239 F. Supp. 3d 426 (D. Conn. 2017), defendants argue that "[a] safe is not contraband, nor is it immediately apparent that it contains contraband". Cook's Post-Hearing Brief [69] at 19. In Robertson, the court concluded

that law enforcement impermissibly seized a closed safe located during a protective sweep conducted in connection with an arrest warrant before they located any contraband associated with the safe or contraband elsewhere in the apartment. 239 F.Supp.3d at 452-53. Although the government makes no attempt to address Robertson, it is readily distinguishable. While the defendant in Robertson was on supervised release at the time of the protective sweep, unlike here, the conditions of his supervised release did not include a search condition and the court otherwise found his supervised release search conditions inapplicable to the unrelated law enforcement search. Id. at 448.

Likewise, pointing to Terry v. Ohio, 392 U.S. 1, 30 (1968), defendants argue that a "general exploratory search" was not permitted. Cook's Post-Hearing Brief [69] at 17. There too, however, the justification for the search was not a search condition that permitted a search of the defendant's home and property. See Terry, 392 U.S. at 29 ("[t]he sole justification of the search in the present situation is the protection of the police officer and others nearby, and it must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer").[8]

Defendants further argue that "[a]lthough a finding of reasonable suspicion arguably justifies a search of Mr. Cook's home - due to his status as a probationer - it does not justify the destruction of his personal property". Cook's Post-Hearing Brief [69] at 17. That may be so, but there is nothing to indicate that the safe was destroyed in any fashion in order to open it. Rather, it was opened by another officer with a "hard tug", suggesting - given the size of the safe - that it was stuck, but not locked. [63] at 66. Though defendants speculate that Deputy

---

[8]     Curiously, the government contends that only the basement of the home was searched. (government's Reply [73] at 2), but that is not supported by the record. See [63] at 67 (there were two other safes found upstairs), 68 (the upstairs search was occurring while the basement search was taking place).

Galbraith "forced his way into the . . . locked safe", they offer nothing to cast doubt on Officer Anderson's testimony concerning the condition of the safe after it was opened.  Cook's Post-Hearing Brief [69] at 18.

5.    **Even if the Search was Invalid, do the Defendants have Standing to Seek Suppression of the Search and Seizure of the Safe?**

The government argues that defendants' disclaimer of ownership in the safe prior to it being opened constitutes an abandonment, and the fruits of its search cannot be suppressed. Government's Post-Hearing Brief [67] at 8. Initially, I note that while the government attempts to assert this argument against both defendants, it is only applicable to Cook.  While the government argues that "*both* [defendants] denied having access to the safe" (government's Reply [73] at 6 (emphasis added)), that is unsupported by record, which contains nothing about whether Ellison disclaimed ownership in the safe.

Whether there has been an abandonment turns on "the intent of the person who is purported to have abandoned the property", which can be inferred "from words spoken, acts done, and other objective facts". <u>United States v. Lee</u>, 916 F.2d 814, 818 (2d Cir. 1990). *See also* <u>United States v. Hannold</u>, 2019 WL 1748148, *5 (W.D.N.Y. 2019) ("a finding of abandonment is not based on a defendant's words alone; it is based on his intent, which may be derived from words, acts and other objective facts").

Although Officer Anderson testified that Cook initially stated that he forgot the combination to the safe and did not know where the key was, thereby suggesting that he may have had at least a possessory interest in the safe at some point, he then unequivocally disclaimed ownership in the safe and provided the name and telephone number of its purported owner.  [63] at 27-28.  Cook's initial statement of forgetting the combination and not knowing

-18-

the location of the key may have cast some doubt on his subsequent unequivocal disclaimer of
ownership in the safe, but "[i]t is irrelevant that the police disbelieve ownership disclaimers or
know that the defendant is lying". United States v. O'Brien, 498 F. Supp. 2d 520, 535 (N.D.N.Y.
2007), aff'd, 303 Fed. App'x 948 (2d Cir. 2008) (Summary Order).

Although Cook points to his subsequent Affidavit of standing that he submitted
asserting an ownership interest in all items discovered in the home (Cook's Reply [74] at 7), "the
relevant question for the issue of abandonment is intent *at the time of the search*". United States
v. Moskowitz, 883 F.2d 1142, 1148 (2d Cir. 1989) (emphasis added).

Defendants further question whether abandonment can apply to a disclaimed
closed container found in a single-family home. Cook's Reply [74] at 8.  While none of the cases
cited by the government address that circumstance, cases have applied abandonment in similar
circumstances.  *See e.g.*, United States v. Anderson, 284 Fed. Appx. 977, 979–80 (3d Cir.2008)
(defendant voluntarily abandoned interest in a locked safe located in his bedroom through
repeated denials of ownership); United States v. Martinez, 842 F. Supp. 467, 472 (D. Kan. 1994)
(declining to suppress where the defendant "abandoned any claim of ownership of the safe or its
contents" that was located in an apartment he allegedly rented).  Therefore, I find abandonment
applicable to the circumstances presented here, and recommend that Cook's motion to suppress
evidence from the safe be denied on the additional basis of his abandonment of that item.

## B.    Defendants' Motion to Suppress Statements

Defendants seek to suppress their statements that were recorded while they were
placed together alone in a closed-door interview room at Erie County Central Police Services
following their arrest on February 26, 2020.  Benz Affirmation [32], ¶¶19-27; Okay Affirmation
[33], ¶¶28-29.  The video recording from the interview room demonstrates that after executing a

written <u>Miranda</u> waiver presented by a detective with the Erie County Sheriff's Office (at approximately 21:20),[9] Cook stated that he did not wish to talk to the detective (21:24:43). Approximately 15 minutes later (at 21:40:10) the detective re-entered the interview room with a task force officer and they discussed with Cook the possibility of cooperating. After listening to them, Cook stated "before I say anything further, I want to talk to my girl", but was told "that can't happen right now". 21:43:56. The conversation ended shortly thereafter when Cook stated, "I just don't want to say anything man. It's over. It's over, yeah", and the agents exited the interview room. 21:45:06.

Approximately five minutes later (at 21:50:43), Ellison was brought into the interview room by another law enforcement officer, who stated "I'll give you a couple of minutes", and reminded them to stay on opposite sides of the table in the interview room. Thereafter, defendants had a very quiet discussion. After approximately seven minutes an officer knocked and entered the room, but at defendants' request shut the door and gave them another minute to finish their conversation. Other than that brief entry, no law enforcement officer was physically present in the interview room during their discussion.

The recording does not indicate whether the video camera that made the recording was open and obvious or whether there were any signs indicating whether audio or video surveillance was occurring. The parties' submissions also do not shed light on that issue. Nevertheless, it is undisputed (from what is captured on the video) that defendants were not told that their conversation was being recorded.

Cook raises several arguments in support of suppression. First, he contends that defendants had a reasonable expectation that their conversation would be private - an expectation

---

[9]    Time-stamps are from the upper right hand corner of the video. All quotations from the video are unofficial.

fostered by the conduct of law enforcement - and the surreptitious recording of their conversation violated the Fourth Amendment. Benz Affirmation [32], ¶¶22, 25-26; Cook's Reply [37], p. 4. Second, he appears to assert a Fifth Amendment violation, arguing that he invoked with right to remain silent and that Ellison was used "without her consent, as a state actor to obtain information from [him] that they otherwise could not obtain". Benz Affirmation [32], ¶¶26, 27. Finally, Cook argues that his statements should be suppressed as fruit of the illegal search. Id., ¶23.

Ellison more narrowly argues that there was no consent by her or Cook to be recorded. Okay Affirmation [33], ¶29. Unlike Cook, she acknowledges that she "did execute a Miranda waiver on 26 February 2020 [*sic*] and did answer questions from law enforcement". Id.

### 1.    Fourth Amendment Claim

Electronic eavesdropping can constitute a search under the Fourth Amendment where it violates a reasonable expectation of privacy. *See* Katz, 389 U.S. at 353 ("[t]he Government's activities in electronically listening to and recording the petitioner's words violated the privacy upon which he justifiably relied while using the telephone booth and thus constituted a 'search and seizure' within the meaning of the Fourth Amendment"). A reasonable expectation of privacy exists where the defendant demonstrates a subjective expectation of privacy that society would determine to be objectively reasonable. *See* Bond v. United States, 529 U.S. 334, 338 (2000). The burden for establishing a reasonable expectation of privacy (both subjectively and objectively) rests with the defendant. *See* United States v. Shelton, 2015 WL 500886, *8 (W.D.N.Y. 2015).

The government contends that defendants lacked a "reasonable expectation of privacy in the interview room at Erie County Central Police Services". Government's Response to Ellison's Pretrial Motion [34], p. 6. Whereas defendants have requested a hearing on this issue, the government has framed it as a legal issue that can be resolved without a hearing. March 1, 2021 hearing transcript [63], p. 92. It relies on United States v. Swift, 623 F.3d 620 (8th Cir. 2010), which it contends "mirrors the facts in this case". Government's Response [35], pp. 5-6. By contrast, Cook points to United States v. Llufrio, 237 F.Supp.3d 735 (N.D. Ill. 2017) as being "more on point . . . . [and] persuasive than Swift". Cook Reply [37], p. 5. Neither case, however, is controlling.

In Swift, the defendant and a cohort were arrested, but before being Mirandized, they were placed together in an interview room that was equipped with video and audio monitoring equipment. 623 F.3d at 620. Although the defendant indicated that he believed that the officers were monitoring their conversation, he made an incriminating statement while in the interview room. Id. In rejecting defendant's motion to suppress that statement on Fourth Amendment grounds, the court explained that he "had no reasonable expectation of privacy while being detained in the interrogation room at the police station, and [he] even recognized the likelihood that officers were watching them". Id., p. 623.

Following his arrest, the defendant in Llufrio, was placed alone in an interview room that could secretly record video and audio. 237 F.Supp.3d at 737-38. While in the room, the recording captured the defendant mumbling to himself. Id., 738. At one point, the defendant saw something that he believed was a "camera for recording", but continued mumbling and whispering to himself. Id. Recognizing that a subjective expectation of privacy can exist while on law enforcement property, the court explained that defendant, who was "alone in closed

-22-

room, spoke to himself and whispered"  took sufficiently "'reasonable safeguards or common-sense precautions taken to preserve his expectation of privacy'" to evidence a subjective expectation of privacy for his statements.  Id., 743. Finding that the defendant's expectation of privacy was objectively reasonable, the court explained that "[w]hile 'courts have held that individuals do not typically have a reasonable expectation of privacy in police interview rooms,' . . .  that cannot be an absolute because even 'prisons are not beyond the reach of the Constitution.'" Id., 745.  "[L]uring arrestees into 'a false sense of security' in a locked room with no law enforcement officers and with no visible working audio-recording device - but with a concealed recording device - suggests that, in such a room, there is a reasonable expectation of privacy." Id.  The court further noted that  even if "a video camera might be necessary to monitor [the defendant's] safety and ensure that he did not escape from the interview room while under arrest and unattended, the Government presents no reason why it would need to record the sounds from the room other than for incriminating purposes while [the defendant] sat alone".  Id.

Even though Llufrio is persuasive, two days after it was decided, the Seventh Circuit decided United States v. Paxton, 848 F.3d 803 (7th Cir. 2017), which casts doubt on the underpinnings of Llufrio.  In Paxton the Seventh Circuit found that a detainee, whose discussions with his co-defendant were recorded while they were being transported in a police van seated in a compartment divided by metal walls with thick plexiglass viewing windows that permitted them to expect that their conversation would only be overheard "if they spoke in an above-normal tone of voice",  lacked an objectively reasonable expectation of privacy.  848 F.3d at 805-06.  Like the interview room in Llufrio, the recording equipment in the van was not visible. However, whereas Llufrio relied on the surreptitious nature of the recording equipment in concluding that the defendant possessed an objectively reasonable expectation of privacy, the

Seventh Circuit took a different view, explaining that "given the increasing presence of unobtrusive, if not invisible, audio and visual surveillance in all manner of places, public and private, one wonders how much of a reminder a detainee needs that he might be under surveillance".  848 F.3d at 812.

Likewise, while <u>Llufrio</u> took a dim view of law enforcement's need and motivation for monitoring the audio from the interview room, the Seventh Circuit held that:

> "Officers . . .  have a significant interest in security that warrants the monitoring of detainees in their custody, to ensure that detainees are not harming one another or attempting escape, or that a detainee has not fallen ill, for example . . . . [I]t is somewhat ironic for the government to invoke this interest, given that it did not use its surveillance equipment to monitor them in real time during their transport to the ATF office (which would have enabled agents to detect and address any safety problems as they arose) and instead only recorded their conversations for later use. But the material point, in terms of the defendants' expectation of privacy, is that the government has legitimate reasons, wholly consistent with the public interest, for monitoring individuals it has taken into its custody and placed into a transport vehicle. Regardless of the agents' actual motivations for monitoring the defendants . . . these legitimate interests reinforce our conclusion that society is not prepared to recognize as reasonable whatever subjective expectations of privacy the defendants may have harbored in their conversations within the van". <u>Id</u>., 812-13.

Even though the continuing viability of <u>Llufrio</u> is questionable in light of <u>Paxton</u>, I disagree with the government's position that a police interview room cannot be a "protected place". Government's Response [35], p. 5.  In support of that argument, it quotes to the following from the Supreme Court's decision in <u>Katz</u>:  "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection". 389 U.S. at 351.  Yet, it ignores the subsequent sentence:  "But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected".  <u>Id</u>.

Nonetheless, it remains that "[t]he expectations of privacy of an individual taken into police custody necessarily are of a diminished scope." <u>Maryland v. King</u>, 569 U.S. 435, 462

(2013). Hence, it is only in "very limited" circumstances, a detainee in a police interview room may still maintain an objectively reasonable expectation of privacy. United States v. Delibro, 2008 WL 11438235, *3 (M.D. Fla.), adopted, 2008 WL 11438236 (M.D. Fla. 2008), aff'd, 347 Fed. App'x 474 (11th Cir. 2009). *See also* Williams v. Lazaroff, 2015 WL 9999840, *6 (N.D. Ohio 2015), adopted, 2016 WL 430397 (N.D. Ohio 2016) ("[g]iven a certain set of facts, a legitimate expectation of privacy may exist though a person is under arrest and in an interrogation room. We do not believe that one can never have a reasonable expectation of privacy in a police interrogation room"). Among the limited circumstances in which a detainee can have an expectation of privacy in an interview room is where "law enforcement takes some action to deceive the defendant or affirmatively represents that conversations are not being monitored". Delibro, 2008 WL 11438235, *4

There is no claim, nor does the video demonstrate, that defendants were ever affirmatively told that their conversation would not be monitored. Hence, resolution of the issue turns on whether law enforcement took some action to deceive defendants into believing that their conversation were not being monitored. Cook points to the fact that he "was never warned he was being filmed or recorded". Benz Affirmation [32], ¶26. However, the video undermines any claim that defendants were deceived or lacked an awareness that their conversations were being monitored. *See* Paxton, 848 F.3d at 812 ("given the increasing presence of unobtrusive, if not invisible, audio and visual surveillance in all manner of places, public and private, one wonders how much of a reminder a detainee needs that he might be under surveillance - particularly in a marked police vehicle – or that this might be so regardless of whether he can see any obvious signs of surveillance devices"). Throughout their closed-door conversations, defendants' discussion was conducted in a hushed tone, with at least one attempted hand signal

(21:56:38), demonstrating their awareness that the room was being monitored.  Since it is evident that defendants "were legitimately and justifiabl[y] concerned that their discussion was being monitored", they have failed to establish that they had a "subjectively reasonable expectation of privacy during the conversation". Delibro, 2008 WL 11438235, *5.

Cook's argument that law enforcement's act "of leaving the room and closing the door", created the "impression that it was just the two of them", does not change that conclusion. Benz Affirmation [32], ¶26.  The "simple act of closing the door was [not] sufficient to create such an expectation. Because this case did not involve any specific or deliberate assurances of privacy, the general rule that suspects have no expectation of privacy in police custody controls." Davis v. State, 121 So. 3d 462, 487 (Fla. 2013).

Cook has also requested a hearing for purposes of determining the officers' motivations for permitting Ellison into the interview room and recording the conversation. *See* March 1, 2021 hearing transcript [63], p. 92.  However, the officers' motivations are not relevant. *See* Paxton, 848 F.3d at 813 ("[r]egardless of the agents' actual motivations for monitoring the defendants", their "legitimate interests" in monitoring detainees "reinforce[s] [the] conclusion that society is not prepared to recognize as reasonable whatever subjective expectations of privacy the defendants may have harbored").  That is especially so here, where any motivation by law enforcement to deceive was detected by defendants who conducted their conversation as if they were being monitored by law enforcement.

Nor have defendants established any other basis for a hearing.  Neither have alleged any facts (*e.g.*, events occurring off camera) to warrant a hearing. *See* United States v. Watson, 404 F.3d 163, 167 (2d Cir. 2005) (generally, an evidentiary hearing on a motion to suppress is required "if the moving papers are sufficiently definite, specific, detailed, and

nonconjectural to enable the court to conclude that contested issues of fact [exist]").  In fact, unlike Cook ([32-1], ¶5), Ellison did not even submit an affidavit (or declaration) indicating that she possessed a subjective expectation of privacy in the interview room [36].

### 2.      Fifth Amendment

To the extent that Cook argues that permitting Ellison to enter the interview room after he invoked his right to remain silent and recording their conversation constituted a violation of his Fifth Amendment rights (Benz Affirmation [32 ], ¶26), that argument is unpersuasive. "Even though officers may have hoped that [defendants] would make incriminating statements when left alone, that action was not express questioning.  Nor does that action rise to the 'functional equivalent' of police interrogation".  <u>Swift</u>, 623 F.3d at 623.

Likewise, Cook argues that following his conversation with Ellison, he was interrogated without his <u>Miranda</u> rights being readministered.  Benz Affirmation [32] at ¶27. The video recording from the interview demonstrates that shortly after Ellison was escorted from the interview room, another officer entered the room to obtain "pedigree information" from Cook (22:01:07) with lasted a couple of minutes.  22:03:30. Following the collection of his pedigree information, the officer explained to Cook that he was going to be transported to the holding center and charged by the state with potential federal charges.  He concluded by asking Cook if he had "any questions" or if he had "anything . . . to add".  In response, Cook asked "what's her situation"? and the conversation continued from there for several minutes with Cook denying knowledge of the contents of the safe.  22:04:00-22:08:20.

As to the conversation that followed the collection of his pedigree information, Cook argues that "consent to speak to the Officers had already been terminated, and . . . [he]

should have been given his <u>Miranda</u> warnings again". Benz Affirmation [32] at ¶27.   It is well-settled that "once <u>Miranda</u> rights have been invoked, interrogation must stop and the invocation must be 'scrupulously honored.'" <u>United States v. Gonzalez</u>, 764 F.3d 159, 165-66 (2d Cir. 2014) (*quoting* <u>Michigan v. Mosley</u>, 423 U.S. 96, 104 (1975)).  "The scrupulously honored standard, at a minimum, requires the government to refrain from questioning a suspect unless the suspect both (1) initiates further conversation; and (2) waives the previously asserted right to silence. . . .  The Government has the burden of proving that suspect waived his right to silence and reinitiated conversation." <u>United States v. Philpot</u>, 2016 WL 8671577, *8 (N.D. Ga. 2016), adopted, 2017 WL 510893 (N.D. Ga. 2017). *See also* <u>Oregon v. Bradshaw</u>, 462 U.S. 1039, 1045–46 (1983) (a defendant may reinitiate contact by expressing "a willingness and a desire for a generalized discussion about the investigation").

Since the government's response is silent on this issue and it makes no attempt to meet its burden, I cannot conclude that it has established that it scrupulously honored Cook's right to remain silent following the collection of his pedigree information (beginning at 22:04:00), and therefore recommend that this portion of his motion be granted.  *See* <u>United States v. Zannino</u>, 895 F.2d 1, 17 (1st Cir 1990) ("Judges are not expected to be mindreaders. Consequently, a litigant has an obligation 'to spell out its arguments squarely and distinctly,' or else forever hold its peace").

## CONCLUSION

For these reasons, I recommend that Ellison's motion for suppression (Okay Affirmation [33], §§I, II) be denied, and that Cook's motion for suppression (Benz Affirmation [32] at §§I, II) be granted to the extent that it seeks to suppress the statements he made after his pedigree information was collected, but otherwise be denied.  Unless otherwise ordered by Judge

Vilardo any objections to this Report and Recommendation must be filed with the clerk of this court by June 30, 2021. Any requests for extension of this deadline must be made to Judge Vilardo. A party who "fails to object timely . . . waives any right to further judicial review of [this] decision". <u>Wesolek v. Canadair Ltd.</u>, 838 F. 2d 55, 58 (2d Cir. 1988); <u>Thomas v. Arn</u>, 474 U.S. 140, 155 (1985).

   Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. <u>Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co.</u>, 840 F. 2d 985, 990-91 (1st Cir. 1988).

   The parties are reminded that, pursuant to Rule 59(c)(2) of this Court's Local Rules of Criminal Procedure, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority", and pursuant to Local Rule 59(c)(3), the objections must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge". Failure to comply with these provisions may result in the district judge's refusal to consider the objection.

Dated: June 16, 2021

          /s/Jeremiah J. McCarthy
          JEREMIAH J. MCCARTHY
          United States Magistrate Judge