UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

     v.

FRANKIE COOK,
SHAWNTEE ELLISON,

        Defendants.

_____

20-CR-84-LJV
DECISION AND ORDER

## BACKGROUND

Defendant Shawntee Ellison has been indicted for conspiring to possess with intent to distribute and to distribute at least 100 grams of heroin and 40 grams of fentanyl (21 U.S.C. § 846); possessing those substances with intent to distribute them (21 U.S.C. §§ 841(a)(1) and (b)(1)(B); 18 U.S.C § 2); maintaining drug-involved premises (21 U.S.C. § 856; 18 U.S.C § 2); and possessing a firearm in furtherance of drug trafficking (18 U.S.C. §§ 924(c)(1)(A)(i) and 2). Docket Item 1. Defendant Frankie Cook has been indicted for each of those crimes as well as for being a felon in possession of a firearm (18 U.S.C. §§ 922(g)(1) and 924(a)(2)). *Id*.

Both defendants have objected to a Report and Recommendation (R&R) issued on June 16, 2021, by Magistrate Judge Jeremiah J. McCarthy and finding that their motions to suppress evidence should in large part be denied. *See* Docket Item 77. More specifically, Judge McCarthy found that both defendants' motions to suppress evidence seized during a search of their residence on February 26, 2020, should be denied. *See id*. at 28. He also found that both their motions to suppress statements

should be denied except as to statements made by Cook "after his pedigree information was collected."  *Id.*

After their time to object was extended several times, *see* Docket Items 79, 81, 85, 86, 91, both defendants filed timely objections to the R&R, *see* Docket Items 87, 88, 89.  On September 7, 2021, the government responded, *see* Docket Item 93, and later in September the defendants replied, *see* Docket Items 96, 97.  On September 30, 2021, the Court heard oral argument and requested additional briefing.  Docket Items 98 and 99.  The defendants again obtained several extensions of time, *see* Docket Items 102, 104, 106, and simultaneous submissions were filed by all parties on November 19, 2021, *see* Docket Items 110, 111, 112; *see also* Docket Item 113 (resubmission by the government).  On November 26, 2021, all parties filed simultaneous responses.  *See* Docket Items 114, 115, 116.

## LEGAL PRINCIPLES

A district court may accept, reject, or modify the findings or recommendations of a magistrate judge.  28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(3).  The court must review *de novo* those portions of a magistrate judge's recommendation to which a party objects.  28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(3).

This Court has carefully and thoroughly reviewed the R&R, the objections, the response, the replies, the supplemental submissions, and the materials submitted to Judge McCarthy.  Based on that *de novo* review and for the reasons that follow, this Court accepts and adopts Judge McCarthy's R&R in its entirety.  The defendants' motions to suppress evidence are denied except as to statements made by Cook after his pedigree information was collected.

2

**FACTS**

In February 2020, Shawntee Ellison and Frankie Cook lived with their two children at 484 Dartmouth Avenue in Buffalo, New York.  Docket Item 63 at 10-11. Cook had recently been sentenced to probation in connection with a state firearm offense and had been assigned to the Gun Violence Elimination Program ("GIVE").  *Id.* at 9.  As a result, a multi-person team, headed by Erie County Probation Officer Deneen Anderson, went to his home on February 26 for the initial, routine GIVE notification visit. *Id.* at 11.  Anderson was accompanied by her supervisor, William Diamond; her partner, Probation Officer Scott Harmon; two other probation officers; and several members of the City of Buffalo Police Department, the Erie County Sheriff's Department, and the "Peacemakers"—a community organization.  *Id.* at 36-37.

Cook, Ellison, and the children were home when the team arrived.  *Id.* at 12.  At first, only Anderson, Harmon, and Diamond entered the home, *id.* at 41-42; the rest of the team remained outside, *id.* at 40.  Anderson had no reason to believe that Cook had any firearms—or any other contraband, for that matter—on the premises.  *Id.* at 73.

As part of the GIVE program, probation officers check probationers' cell phones for social media postings about weapons and otherwise to "keep them safe."  *Id.* at 33-34.  Anderson therefore asked to see Cook's cell phone; Cook told her that he did not have one and that he used Ellison's.  *Id.* at 13.  Anderson asked, "Can I see that?" and Cook said that it was "downstairs."  *Id.*

Cook then went "downstairs"—that is, to the basement—presumably to get the phone.  *See id.* at 14.  Anderson and Harmon followed "for essentially safety reasons": Anderson explained that especially because she had no prior contact with, or

knowledge about, Cook, she thought it prudent not to allow him to go unaccompanied to another part of the residence. *Id.* at 14, 36, 44, 73. Once in the basement, Cook retrieved the phone from near a couch. *Id.* at 49.

But the basement aroused Anderson's suspicions. She first observed "a small little pit bull . . . chained up to a metal pole" in the basement; when she asked Cook whether the puppy ever went "upstairs [to] be around the family," Cook responded no— that he planned to use the puppy as a guard dog and therefore "doesn't want him to be friendly." *Id.* at 14-15. She also saw a counter with what she believed was drug paraphernalia: baggies, plastic gloves, and masks. *Id.* at 15. She saw a large speaker blocking a door. *Id.* And she saw Cook repeatedly glancing toward the counter and the door. *Id.* at 18-19. As Anderson watched Cook retrieve the phone, Harmon "eyeball[ed] everything," seeing the same things. *Id.* at 50.

Anderson walked Cook upstairs while Harmon began to search the basement. *Id.* at 19, 50. Anderson asked Diamond to watch Cook and informed the police and sheriff's department officers outside about the search that now was going on in the house. *Id.* at 50. She then returned to the basement where she saw Harmon open the door that had been blocked by the speaker to reveal a "little alcove" with a large safe. *Id.* at 19-20.

Anderson tried to open the safe, but she was unsuccessful and assumed that it was locked. *Id.* at 20, 64. Cook was asked for keys and a combination, but he said that "he didn't know where the keys were," that he "forgot" the combination, and that it was his landlord's safe anyway. *Id.* at 27, 84. Eventually, Sheriff's Deputy Robert Galbraith

gave the safe handle "a hard tug . . . and it opened." *Id*. at 66.  Inside the safe was a firearm, heroin, and fentanyl.  *Id*. at 23-26.

Cook and Ellison were arrested and taken to Erie County Central Police Services.  Docket Item 87 at 3.  After being given his *Miranda* warnings in a police interview room, Cook said that he did not want to talk to the officers; when he was pressed about cooperating, Cook said that "before [he said] anything further, [he] want[ed] to talk to [his] girl."  Docket Item 77 at 20 (quoting Docket Item 32-1 at 7 (Exhibit C)).  A few minutes later, an officer brought Ellison into the interview room and told Cook, "I'll give you a couple of minutes."  *Id*.  After the officer left and shut the door, Cook and Ellison talked quietly.  *Id*.  When an officer knocked and entered the room, the defendants asked for another minute to finish their discussion.  The officer obliged, left the room, and shut the door.  *Id*.

The interview room was under surveillance, and the conversation between Cook and Ellison was recorded.  *Id*.  The record is silent about whether the cameras and microphones were visible.  *Id*.

A short time later, an officer asked Cook pedigree questions which Cook answered.  Docket Item 32-1 at 7 (Exhibit C); Docket Item 77 at 27-28.  The officer then asked Cook whether he had any questions or anything to add, and they engaged in a conversation about the events earlier that day.  *Id*.

## DISCUSSION

### I.   SEARCH OF 484 DARTMOUTH

The defendants urge this Court to suppress all evidence found during the warrantless search of their home.  Docket Items 87, 88, 89.  They argue that even the

lesser standard of reasonable suspicion applicable to probationers was not met because the probation and law enforcement officers admittedly had no reason to suspect that they would find contraband during their home visit.  Docket Item 87 at 4-20; Docket Item 89 at 1-7; Docket Item 97 at 3; Docket Item 111 at 5-8; Docket Item 115 at 1-4.

The government responds that reasonable suspicion was not necessary.  Docket Item 110 at 6.  Citing the Second Circuit's recent decision in *United States v. Braggs*, 5 F. 4th 183 (2d. Cir. 2021), the government says that as long as a search by a probation officer "is reasonably related to the . . . officer's duties," that search does not violate the probationer's rights.  *See* Docket Item 110 at 6.

The defendants then reply that Braggs was a parolee, not a probationer; they note that the Supreme Court has held that parole is an extension of imprisonment and that the rights of parolees therefore are less than those of probationers.  Docket Items 111 and 112; *Samson v. California*, 547 U.S. 843, 850 (2006) ("[P]arolees have fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is to imprisonment.").  The defendants also observe that the most intrusive part of the search—opening the door of the safe—was done not by a probation officer but by a deputy sheriff.  Docket Item 111 at 4-5.

The defendants focus too narrowly on the standard for searching a probationer. The government focuses perhaps too broadly on the "special needs" doctrine behind the *Braggs* decision.  Analyzing the encounter that led to the search by looking at each of its component steps best addresses the legal issues that govern the search here.

### A.     The Home Visit

The defendants do not contest the visit to the home by members of the probation department, law enforcement, and the community, Docket Item 99 at 14—and with good reason.  Certainly, a visit to a probationer's home by probation officers cannot violate a probationer's rights, and bringing police or members of a community organization along with them as part of a program such as GIVE does not change that commonsense proposition one iota.

### B.     The Request to See the Cell Phone

The defendants contest Judge McCarthy's finding that Cook voluntarily retrieved the cell phone and agreed to let Anderson look at it when she asked to see it.  Docket Item 87 at 4-6; Docket Item 89 at 4-7.  And they seem to imply that the request to see the phone was itself a violation of their rights.  Docket Item 87 at 5-8; Docket Item 97 at 1-2.   The defendants are incorrect on both counts.

If *Braggs* permits anything, it permits a probation officer to ask a probationer for his cell phone.  In that case, the Second Circuit observed that "the trial courts in this Circuit" have sometimes "misunderstood" the effect of Supreme Court precedent on the court's "[s]pecial [n]eeds jurisprudence."  *Braggs*, 5 F.4th at 187.  As a result, the court noted, "two strands of . . . Fourth Amendment jurisprudence," including how "to evaluate parole searches," have been "muddled or overlooked."  *Id*. at 186.  The court held that because the search of the parolee's house in *Braggs* "was reasonably related to the performance of the [parole] officers' duties," it necessarily was "constitutionally permissible."  *Id.* at 188.  In other words, the Second Circuit found that even a

warrantless search based on less than reasonable suspicion was constitutionally permissible in light of the "special needs" of parole officers to perform their supervision.

To be sure, Braggs involved a parolee, not a probationer such as Cook. *Braggs*, 5 F.4th at 185. And as the defendants correctly argue, because parole is an extension of imprisonment, probationers are entitled to greater protections than parolees. For that reason, the government may go too far in its argument that any search by a probation officer of a probationer's home is constitutional in light of the special needs doctrine.[1] But there is little doubt that a probation officer can ask for a probationer's cell phone as part of the officer's duties. Even if that request is a search that might not be permitted if made to someone encountered by a police officer on the street, the special needs doctrine permits a probation officer to ask a probationer that question.

Here, Anderson testified explicitly that asking to see a GIVE probationer's cell phone is what "we do." Docket Item 63 at 13. She later explained that because of the wide use of social media, her duties as a GIVE program officer include "a search of [a probationer's] cell phone." *Id*. at 33. "We want to make sure that they're not posting with any guns with any social media," she said, "to keep them safe." *Id*. at 34. So asking to see Cook's cell phone was part of Anderson's duty as Cook's probation officer, and the special needs doctrine permitted that inquiry.

The defendants make much of the fact that several armed officers were part of the team that visited the home, and they argue that Cook never voluntarily consented to

---

[1] This Court need not, and does not, resolve this issue. Perhaps the result in *Braggs* would be the same even if the defendant were a probationer and not a parolee; perhaps the result would be different because parolees are entitled to less protection given their status. Regardless, the search here did not violate the defendants' rights for the other reasons noted.

the request.  But that argument finds no support in the record.  First, nothing in the record suggests that Anderson demanded the phone—or did anything other than simply ask whether she could see it.  *Id*. at 13.   Moreover, while other police officers and deputy sheriffs were part of the team, only Anderson, her partner, and her supervisor—three probation officers—were present in the house when the request was made.  *Id*. at 41-42.  Anderson testified that the probation officers were armed, *id*. at 44, but there is nothing in the record to suggest that they ever drew their guns or even that the defendants knew that the officers were armed.  So there is no reason to believe that Cook did not voluntarily consent to provide the cell phone that he shared with Ellison.[2]

In sum, there was nothing about the request to see the cell phone or Cook's consent to provide it that violated the defendants' rights.

### C.     The Trip to the Basement

When Cook went to the basement to get the phone, Anderson and Harmon went with him.  There was nothing wrong with that, either.

Of course, probation officers are permitted to take reasonable steps to protect themselves when visiting a probationer's home.  *United States v. Miller*, 430 F.3d 93 (2d Cir. 2005).  Anderson testified that she and her partner "followed [Cook] for essentially safety reasons."  Docket Item 63 at 14.  She later explained that she "didn't know Mr. Cook" and that even if she did she would not let a probationer go unaccompanied to a basement during a home visit because "I don't know what's down there in the

---

[2] This Court need not, and therefore does not, reach the thornier question of whether the special needs doctrine might permit a probation officer to compel a probationer to provide his cell phone under circumstances like those here.

basement" and because "it's safety for us." *Id*. at 44.  What is more, Cook was on

probation precisely because of a weapons conviction, and the GIVE program that

prompted the visit is designed precisely to eliminate gun violence.

The parties did not address this issue in their post-hearing memoranda; in the

R&R, however, Judge McCarthy concluded that Officer Anderson's decision to

accompany Cook to the basement to retrieve Ellison's cell phone "appear[ed] aligned

with a protective sweep, which is permissible in circumstances other than warrant

executions."  Docket Item 77 at 13 n.4 (citing *Miller*, 430 F.3d at 100).  In his objections,

Cook asserts that "*Miller*[] specifically requires that 'specific, articulable facts giving rise

to a reasonable inference of danger' must be present before a protective sweep can be

performed."  Docket Item 87 at 8.  Although Officer Anderson testified that there was no

specific reason to believe that there were firearms in the premises, she also testified

that neither she nor the other officers knew Cook and Ellison, that there always is a

concern for officer safety, and, therefore, that they always want to "keep [their] eyes on

the [supervised] person."  *See* Docket 63 at 73.   Especially because both the GIVE

program and Cook's prior conviction involve weapons, Anderson's testimony provided a

sufficient reasonable inference of danger under *Miller*.

Following Cook to the basement while he retrieved his cell phone therefore was

reasonable and appropriate.  And that led to the reasonable suspicion that justified the

rest of the search.

### D.    The Search

Once in the basement, Anderson and Harmon had reasonable suspicion to

search the premises.  And while the defendants do not agree with that factual

conclusion, they do agree that reasonable suspicion would justify a warrantless search of a probationer.  Docket Item 87 at 8-20; Docket Item 99 at 3; *see United States v. Ojudun*, 915 F.3d 875, 882 (2d Cir. 2019) (An officer has "reasonable suspicion when [s]he is in possession of 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion.'") (citations omitted); *see also Navarette v. California*, 572 U.S. 393, 397 (2014) ("The standard takes into account the 'totality of the circumstances–the whole picture.'  Although a mere 'hunch' does not create reasonable suspicion . . . the level of suspicion the standard requires is 'considerably less than proof of wrongdoing by a preponderance of the evidence,' and 'obviously less' than is necessary for probable cause.") (internal citations omitted).

What Anderson saw in the basement provided more than enough to raise her reasonable suspicion.  She saw a puppy, a counter with what she believed was drug paraphernalia: baggies, plastic gloves, and masks.  Docket Item 63 at 14-15.  That alone would have been enough.  *See Ojudun*, 915 F.3d at 882; *Navarette*, 572 U.S. at 397; *see also Moore v. Bitca*, 2020 WL 5821378, at *18 & n.13 (D. Vt. Sept. 30, 2020) (collecting cases finding that drug paraphernalia supported reasonable suspicion).  But she also saw a large speaker blocking a door, and she saw Cook repeatedly glancing toward the counter and the door.  Docket Item 63 at 18-19.  Viewing the totality of the circumstances, the presence of the puppy, gloves, masks and baggies on the counter, a large speaker blocking a door, and Cook's glances toward the speaker, the door and the counter, Anderson had enough to establish reasonable suspicion.  *See United States v. Bailey*, 743 F.3d 322, 332 (2d Cir. 2014) ("[T]he court must view the totality of

11

the circumstances through the eyes of a reasonable and cautious police officer on the scene."); *United States v. Stigler*, 2008 WL 11429610, *4 (S.D. Iowa 2008) ("Plastic baggies are often associated with the illegal drug trade."); *United States v. Coulombe*, 2007 WL 4192005, *5 (N.D.N.Y. 2007) ("While no single factor is dispositive, courts have sometimes focused on certain factors that are especially probative, including a suspect's . . . nervous behavior or demeanor"); *United States v. Jackson*, 663 Fed. App'x 31, 34 (2d Cir. 2016) (summary order) ("Even if each of these facts, viewed in isolation, would not necessarily establish reasonable suspicion that [the defendant] had become involved in drug trafficking, when considered in the aggregate, they certainly do.").

The defendants suggest that Harmon's "eyeball[ing] everything" in the basement was somehow a Fourth Amendment violation.  Docket Item 87 at 9-11.  But looking at what is in plain view is hardly an intrusion on the right to be free from unreasonable searches and seizures.  "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection."  *Katz v. United States*, 389 U.S. 347, 351 (1967).  "[E]yeball[ing] everything" means doing nothing more than looking at exactly that.

At this point, Anderson and her colleagues had the reasonable suspicion necessary to do a full-blown search of a probationer.  The only remaining issue is whether that permitted them to search the safe.

### E.      The Safe

The issue that gives this Court the most pause is the search of the safe. Anderson testified that after she was unable to open the safe and assumed it was

locked, Docket Item 63 at 64, she was told by the Buffalo Police Department to get a warrant, *id*. at 66.  But she did not do that; instead, she said, Deputy Sheriff Galbraith assisted, gave the handle "a hard tug . . . hip down," and opened the safe.  *Id.*

The defendants argue that opening a locked safe exceeded the bounds of any reasonable search.  Docket Item 87 at 20-22.  Anyone would know that, they say, as evidenced by the advice from the police to get a warrant.  *Id*. at 22.  The safe was not locked, the government responds.  Docket Item 93 at 6.  No tools were used to open it, and it was not damaged after it was opened.  Docket Item 113 at 4.

The problem is that Anderson was the only person who testified at the hearing, and she was not even present when the safe was opened.  Docket item 63 at 66; Docket Item 87 at 20.  Why the government did not call Galbraith, the person who opened the safe, to testify—or at least call as a witness someone who was present as a witness when it was opened—is anyone's guess.  Despite the sloppy evidence, Judge McCarthy concluded that there was enough to find that the safe "was stuck, but not locked."  Docket item 77 at 17.  Although it is a close call, this Court agrees.

A transcript of Galbraith's testimony at a state court felony hearing was admitted without objection as a hearing exhibit,[3] Docket item 61-3, and Galbraith testified unequivocally that the safe "was not locked"—that he simply "put [his] hand on the handle and opened it," *id*. at 25-26.  Over defendant Cook's objection that Anderson was not present when the safe was opened, Judge McCarthy permitted Officer Anderson to testify about her observations of the contents of the safe being removed as

---

[3] The transcript of Galbraith's felony hearing testimony was marked as a defense exhibit and admitted by stipulation at the evidentiary hearing before Judge McCarthy.  Docket Item 63 at 4-5.

well as about how she understood it was opened.  Docket Item 63 at 21-22.    And while

the absence of any damage to the safe does not, as the government suggests, prove

that the safe was not locked, Docket Item 99 at 7-10, it does corroborate Anderson's

and Galbraith's testimony to that effect.

Judge McCarthy found that Cook also disclaimed ownership of the safe and that

his motion to suppress evidence from the safe should be denied for that reason as well.

*See* Docket Item 77 at 18-19.  This Court agrees.  Cook said that the safe was his

landlord's and "provided the name and telephone number of its purported owner," *id.* at

18 (citing Docket Item 63 at 27-28); he therefore "unequivocally disclaimed ownership in

the safe," *id.*  And that is another reason why his motion to suppress the safe contents

is denied.

### F.      Conclusion

For all those reasons, the search of the premises at 484 Dartmouth did not

violate the defendants' rights.  Therefore, and for the reasons in Judge McCarthy's

R&R, the defendants' motions to suppress the fruits of that search are denied.

## II.     THE STATEMENTS IN THE POLICE INTERROGATION ROOM

After the defendants were arrested, they were taken to police headquarters.

Docket Item 32 at 8-11; Docket Item 32-1 at 7 (Exhibit C); Docket Item 77 at 20; Docket

Item 87 at 3.  Cook was placed in an interrogation room, was advised of his rights, and

declined to talk with the police.  Docket Item 77 at 20.  He asked to speak with Ellison,

however, and the police accommodated that request; they brought Ellison to the room,

shut the door, and left.  *Id.*  When the police knocked on the door a few minutes later,

Cook asked for more time, and they accommodated that request as well.  *Id.*

While in the room, Cook and Ellison spoke in hushed tones and used sign language to communicate.  *Id.* at 25-26 (citing Docket Item 32-1 at 7 (Exhibit C)).  But their conversation nevertheless was seen and heard via cameras and microphones.  *Id.* at 20.  And they have moved to suppress that conversation as having been intercepted in violation of their Fourth and Fifth Amendment rights.  *See* Docket Item 77 at 20-21.

This Court agrees with Judge McCarthy that the defendants' motions to suppress the conversation between them should be denied.  As Judge McCarthy noted, to establish a violation of their expectation of privacy, the defendants must clear two hurdles: they must show that their expectation of privacy was "objectively reasonable," and they must demonstrate a "subjective expectation of privacy" as well.  *See id.* at 21 (citing *Bond v. United States*, 529 U.S. 334, 338 (2000)).  The defendants stumble on both hurdles here.

First, the defendants were in a *police station interview room*.  It is difficult to fathom a place where an objective expectation of privacy would be less.  In today's world, one would expect police interview rooms to be equipped with cameras and microphones—if not to get incriminating evidence from suspects, then to record police misconduct and to protect police from false misconduct accusations.

The caselaw largely supports that conclusion.  In *United States v. Swift*, 623 F. 3d 620 (8th Cir. 2010), for example, the court expressly found that a defendant "had no reasonable expectation of privacy while being detained in the interrogation room at the police station," *id*. at 623.  Likewise, in *United States v. Paxton*, 848 F.3d 803 (7th Cir. 2017), the court reached the same conclusion with respect to a police van in which the passengers were separated from the police by plexiglass and metal walls that led them

to believe that their conversation would be overheard only if they spoke loudly, *id*. at 811-12; *see also Maryland v. King*, 569 U.S. 435, 462 (2013) (finding that the "expectations of privacy of an individual taken into police custody necessarily are of a diminished scope"). *But see United States v. Llufrio*, 237 F. Supp. 3d 735 (N.D. Ill. 2017) (defendant left alone in interview room who talked to himself had reasonable expectation of privacy).

This Court agrees with Judge McCarthy that the rule is not without exception and that there might be some circumstances when even a police interrogation room gives rise to a reasonable expectation of privacy. *See* Docket Item 77 at 24. For example, "a detainee [might] have an expectation of privacy in an interview room [if] 'law enforcement takes some action to deceive the defendant or affirmatively represents that conversations are not being monitored.'" *Id.* at 25 (quoting *United States v. Delibro,* 2008 WL 11438235, *3 (M.D. Fla.), *adopted*, 2008 WL 11438236 (M.D. Fla. 2008), *aff'd*, 347 Fed. App'x 474 (11th Cir. 2009); *see also Williams v. Lazaroff*, 2015 WL 9999840, *6 (N.D. Ohio 2015), *adopted*, 2016 WL 430397 (N.D. Ohio 2016) ("We do not believe that one can never have a reasonable expectation of privacy in a police interrogation room.").

But there is no evidence of such deception here. Although the record is silent about whether the cameras and microphones were visible, *see* Docket Item 77 at 20, there is no reason to believe that the defendants were misled in any way. For example, the defendants were never told that their conversation would not be monitored, nor does the video show any deception by law enforcement. *See id*. at 25. In fact, other than by noting that the police shut the door to the room and did not affirmatively warn the

defendants that their conversation might be recorded, the defendants point to nothing suggesting any deception.

And the defendants' conduct in the room suggests just the opposite—that they well knew that their conversation might be monitored.  As Judge McCarthy noted, they spoke "in a hushed tone, with at least one attempted hand signal, demonstrating their awareness that the room was being monitored."  *Id.* at 26 (citation to video omitted). That corroborates the lack of police deception, and it undermines the subjective element necessary for the defendants to establish their reasonable expectation of privacy. *United States v. Shelton*, 2015 WL 500886, at *8 (W.D.N.Y. 2015).

In sum, this Court agrees with Judge McCarthy that the defendants did not have a reasonable expectation of privacy in the interrogation room.  And because Cook actually asked to see Ellison, this Court agrees that permitting him to talk with her was not the equivalent of police interrogation and a violation of Cook's Fifth Amendment rights.  Docket Item 77 at 27.  For that reason, the defendants' motion to suppress their conversation in the police interrogation room is denied.

## III.    THE POST-PEDIGREE CONVERSATION

Judge McCarthy recommended that this Court grant Cook's motion to suppress his statements insofar as it addresses information provided "following the collection of his pedigree information (beginning at 22:04:00)."  *Id.* at 28.  The government did not object to that recommendation, and the time to do so now has expired.  Because the government waived its right to have this Court address that part of the R&R, *id.*, the Court accepts and adopts it.

## CONCLUSION

For the reasons stated above and in the R&R, Cook's motion to suppress any statements he made after "the collection of his pedigree information (beginning at 22:04:00)" is GRANTED, and the defendants' motions to suppress are otherwise DENIED.  The government shall file a motion to set a trial date.

SO ORDERED.

Dated:   December 27, 2021
            Buffalo, New York


            */s/ Lawrence J. Vilardo*
            LAWRENCE J. VILARDO
            UNITED STATES DISTRICT JUDGE